**RECORD NO. 14-7161**

## IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

RYAN STILLMAN LUCAS,

*Plaintiff-Appellant,*

v.

GARY L. SHIVELY
and
PATRICK LAMB,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION
(THE HON. MICHAEL URBANSKI)

**OPENING BRIEF OF APPELLANT**

John P. Fishwick, Jr.
LICHTENSTEINFISHWICK, PLC
101 S. Jefferson Street, Suite 400
P.O. Box 601
Roanoke, VA 24004-0601
(540) 345-5890
jpf@vatrials.com

*Counsel for Appellant*
*Ryan Stillman Lucas*                                    October 21, 2014

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____        Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____

(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    YES    NO


2.    Does party/amicus have any parent corporations?                    YES    NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                YES    NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    YES    NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    YES    NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    YES    NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____    Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE
**************************

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____    _____
(signature)                                                        (date)

# TABLE OF CONTENTS

Table of Authorities…………………………………………………… iii

Statement of Jurisdiction…………………………………………… 1

Statement of the Issues……………………………………………… 2

Statement of the Case………………………………………………… 2

Summary of the Argument…………………………………………… 23

Argument……………………………………………………………… 25

I.    The District Court Erred In Granting Summary Judgment In
      Favor Of Defendants Lamb And Shively On The Federal
      Claims…..……………………………………………….. 25

      A.    Standard of Review…………………………………… 25

      B.    Argument………………………………………………… 26

            1.    The District Court Erred In Resolving Disputed
                  Issues Of Material Fact Which Should Have Been
                  Submitted To A Jury………………………………… 26

            2.    The District Court Erred In Ruling As A Matter Of
                  Law That Defendants Had Probable Cause To Seek
                  Arrest Warrants For Ryan………………………… 32

            3.    Defendants Violated Ryan's Rights When They
                  Continued To Detain Him After Probable Cause Had
                  Dissipated……………………………………………… 38

II.   The District Court Erred In Granting Summary Judgment In
      Favor Of Defendants On The State Law Claims…………….. 39

      A.    Standard of Review…………………………………… 39

B.    Argument……………………………………………… 40

Conclusion……………………………………………………………... 42

Request for Oral Argument……………………………………………. 43

Certificate of Compliance…………………………………………….... 43

Certificate of Service………………………………………………… 44

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)……………… 26

*Bain v. Phillips, 227 Va. 387*, 228 S.E.2d 576 (1976)……………… 41

*Baker v. McCollan,* 443 U.S. 137 (1979)…………………….……….. 32

*Beck v. Ohio,* 379 U.S. 89 (1964)…………………….……………….. 33

*BeVier v. Hucal,* 806 F. 2d 123 (7th Cir. 1986)……………………… 38

*Bland v. Roberts*, 730 F.3d 368 (4th Cir. 2013)……………………… 25, 39

*Brown v. Gilmore*, 278 F.3d 362 (4th Cir. 2002)……………………... 32, 33

*Celotex Corporation v. Catrett*, 477 U.S. 317 (1986)……………….. 26

*Clinchfield Coal Corporation v. Redd*,
123 Va. 420, 96 S.E. 836 (1918)……………………………………….. 41

*Clipper v. Takoma Park, Md.*, 876 F.2d 17 (4th Cir. 1989)………….. 35

*Coughlan v. Jim McKay Chevrolet, Inc.*,
18 Va. Cir. 265, 1989 WL 646697 (Fairfax Co. 1989)……………… 40

*Evans v. Technologies Applications & Service Co.*,
80 F.3d 954 (4th Cir. 1996)……………………………………….... 27

*Franks v. Delaware*, 438 U.S. 154 (1978)…………………………... 34

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)…………………………. 27

*Henderson v. Simms*, 223 F.3d 267 (4th Cir. 2000)………………….. 27

*Henry v. Purnell*, 625 F.3d 524 (4th Cir. 2011)……………………… 35

*Malley v. Briggs*, 475 U.S. 335 (1986)…………………………………      28, 33, 34

*Miller v. Prince George's County, Maryland,*
475 F.3d 621 (4th Cir. 2007)……………………………………………      28, 34, 35

*Monteiro v. City of Elizabeth*, 436 F.3d 397 (3rd Cir. 2006)…………      28

*Montgomery Ward & Company v. Wickline,*
188 Va. 485, 50 S.E.2d 387 (1948)…………………………………      40

*Niese v. Klos*, 215 Va. 701, 222 S.E.2d 798 (1976)…………………      41

*Porter v. U.S. Alumoweld Company*, 125 F.3d 243 (4th Cir. 1977)….      26

*Pritchett v. Alford*, 973 F.2d 307 (4th Cir. 1992)……………………..      33

*Rainey v. Conerly*, 973 F.2d 321 (4th Cir. 1992)……………………..      27

*Russell v. Microdyne Corp.*, 65 F.3d 1229 (4th Cir. 1995)…………...      26

*Smith v. Button,*
43 Va. Cir. 379, 1997 WL 33621883 (Richmond City 1997)………...      41

*Sosebee v. Murphy*, 797 F.2d 179 (4th Cir. 1986)……………………      27

*Street v. Surdyka*, 492 F.2d 368 (4th Cir. 1974)………………………      32

*Torchinsky v. Siwinski*, 942 F.2d 257 (4th Cir. 1991)………………...      34

*United States v. Black*, 70 F.3d 541 (4th Cir. 2013)…………………      35

*United States v. Colkley*, 899 F.2d 297 (4th Cir. 1990)………………      34

*United States v. Garcia*, 848 F.2d 58 (4th Cir. 1988) .........................      32

*United States v. Jarrett*, 338 F.3d 39 (4th Cir. 2003)…………………      32

*United States v. Mendenhall*, 446 U.S. 544 (1980)…………………..      32

*United States v. Ortiz-Hernandez*, 427 F.3d 567 (9th Cir. 2005).........     38

*Wilson v. Russo*, 212 F.3d 781 (3rd Cir. 2000)………………………     28

**CONSTITUTIONAL PROVISIONS, STATUTES, RULES, TREATISES**

U.S. Const. Amendment IV…………………………………………..     32

28 U.S.C. Sec. 1291…………………………………………………     1

28 U.S.C. Sec. 1331………………………………………………….     1

28 U.S.C. Sec. 1343………………………………………………….     1

28 U.S.C. Sec. 1367…………………………………………………     1

42 U.S.C. Sec. 1983.................................................................     32

F.R.C.P. 56 ...................................................................     26, 40

*Restatement, 2nd of Torts*, Sec. 655,
Continuing Criminal Proceedings…………………………………     41

Prosser, *The Law of Torts*, Sec. 119…………………………….     41

No. 14-7161

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

RYAN STILLMAN LUCAS,

*Appellant,*

v.

GARY L. SHIVELY and PATRICK LAMB*,*

*Appellees.*

On Appeal from the United States District Court
for the Western District of Virginia
Roanoke Division (The Hon. Michael Urbanski)

BRIEF OF THE APPELLANT

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this action pursuant to 28 U.S.C.

§§1331, 1343 and 1367.  The district court entered final judgment in favor of

defendants on July 7, 2014.  Ryan Lucas filed a timely notice of appeal on August

4, 2014. (JA 1384). This Court has jurisdiction over the appeal pursuant to 28

U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.    Did the district court err in granting summary judgment for Defendants

Lamb and Shively on the federal claims when it:

    A.    resolved disputed issues of material fact rather than submitting them

    to a jury trial?

    B.    ruled that Defendants Lamb and Shively had probable cause to seek

    arrest warrants for Ryan Lucas?

    C.    granted summary judgment even though defendants violated Ryan

    Lucas's rights when they continued to detain him after probable cause had

    dissipated?

II.    Did the district court err in granting summary judgment for defendants on

the state law claims?

## STATEMENT OF THE CASE

Ryan Lucas filed this civil rights action against Patrick Lamb, a Detective

with the Fredericksburg Police Department, and Gary Shively, an Investigator with

the Franklin County Sheriff's Office, seeking recovery under federal and state law

for false arrest, illegal arrest and imprisonment, and malicious prosecution. (JA 8).

Ryan Lucas was improperly arrested and imprisoned from April 24 - 27, 2012,

based on an erroneous fingerprint identification made by Lamb and used by Shively. Defendants ignored exculpatory information concerning the crimes and obtained arrest warrants without probable cause. They arrested Ryan and detained him upon charges which were terminated in his favor. Defendants did not verify Lamb's fingerprint analysis, and did not conduct a basic investigation prior to obtaining the arrest warrants, yet improperly represented to the issuing magistrates that they had probable cause to believe that Ryan had committed burglaries in Fredericksburg on March 22, 2012, and Franklin County in December, 2009. Defendants continued to detain Ryan even after probable cause had dissipated.

Defendants filed for summary judgment, arguing that they were entitled to qualified immunity, and seeking to have all claims against them dismissed. (JA 802, 804). The district court heard the motions on April 25, 2014 and requested supplemental briefing on fingerprint analysis. (JA 1157-1159). The district court also requested the full deposition transcripts for defendants and for Ryan's forensic expert, Robin Young. After considering the evidence provided on summary judgment and the extra evidence and submissions, the district court granted summary judgment for defendants. (JA 1383). In doing so, the district court improperly resolved disputed issues of material fact. The district court essentially and improperly reduced the summary judgment inquiry to the sole question of whether Lamb's failure to verify the fingerprint identification was reckless, and

failed to give weight to the other evidence before the court. There are genuine issues of material fact in dispute as to all the claims, state and federal, against defendants, and the court should have denied summary judgment. The following evidence was presented on summary judgment.

**Ryan Lucas**

Ryan is 35 years old and has resided in and around Hardy, Virginia for most of his life. (JA 977). His parents are lifelong residents and his sister lives in the area as well. Ryan lives with his wife, their toddler son, his middle school aged son from a previous marriage, and his parents, in a shared home located on Hardy Road. (JA 978-981). He has worked continuously since he left school after completing the tenth grade. (JA 977, 985). Ryan works in Salem, Virginia at Concrete Pipe & Precast and has been employed there since May 2011. (JA 985-986). He is approximately 5 foot 8 inches tall and weighs about 210 to 220 pounds, a weight he has maintained since he was about 15 years old. (JA 982). He has tattoos on his left upper arm, his right upper arm, the upper right side of his chest, and one on the inside of his left forearm. (JA 1025-1027). He has brown straight hair cut short. (*Id.*) When Ryan was 18, he was charged with under-aged possession of alcohol and was fingerprinted. (JA 1013-1014). Approximately 10 years later, he was charged and pled guilty to a DUI, but he had never been

charged with a felony. (JA 1010-1012).  Ryan has no ties to Fredericksburg and has never been there. (JA 998-999, 1019).

**Franklin County Burglary**

In December 2009, a burglary occurred at the Shyeb residence in the Smith Mountain Lake area of Hardy, Virginia. (JA 933-937).  Defendant Shively investigated the burglary and retrieved a fingerprint which was entered into the Automated Fingerprint Identification System ("AFIS"). (*Id*.)  Shively also retrieved a footwear impression from the rear door of the residence. (*Id*.)  The burglar(s) had entered the residence by forcing a door into the garage and one into a separate detached garage. (*Id*.)  The suspect(s) removed a 50" plasma TV, VCR/DVD recorder, 16 gauge shotgun, a computer game, three chain saws and an air compressor. (*Id*.)  Shively never received a lead from AFIS, and the investigation went dormant. (JA 65).

**Fredericksburg Burglary**

On March 22, 2012, a burglary occurred at the Gaffney residence in Fredericksburg, Virginia. (JA 955-956).  The suspect entered the home through an unlocked door and took only cash from the residence, bypassing credit cards and electronics. (JA 958-959, 410-411). The owners walked in on the suspect, and described him as a white, shirtless male with distinctive full sleeve tattoos on his arms, weighing 150 pounds. (JA 712-713). Lamb investigated the case and

5

retrieved a fingerprint from a piggy bank which had been discarded outside the residence. (JA 960-961). Lamb recovered six good prints off the piggy bank. (*Id*.) He also retrieved a footprint outside the residence, size 9 or 10. (JA 713).  Similar burglaries, involving only cash, had recently occurred in the Fredericksburg area. (JA 413-414).

Lamb believed that a homeless man from a homeless camp near the residence was responsible for the Gaffney and other Fredericksburg area burglaries.  A homeless man thought that the suspect's first name might be "Ryan." Lamb stated he did not rely on this information, though, and the homeless man was immediately taken to a mental health and substance abuse treatment center after speaking with Lamb. (JA 713, 388).

Lamb ran one of the latent fingerprints recovered from the piggy bank through AFIS for known contributors. (JA 325). Although Ryan's prints were registered in AFIS from his previous arrests, AFIS did not return a "hit" on Ryan's prints. (*Id*.)  Lamb then ran the same latent fingerprint through AFIS for unknown contributors. (JA 962-963). Out of the several results returned by the system, Lamb selected the latent print from the Shyeb burglary for comparison and determined that the prints "matched." (JA 938)  Lamb reported that he had "individualized" the prints. (JA 962-963). "Individualization" is a significant term in fingerprint science; it means that an examiner has examined and verified a comparison and

determined that the prints come from the same source. (JA 968-971). Lamb, who refers to himself as an expert fingerprint examiner, now states that he really did not individualize the prints, because he could not have done so without the actual latent lifts to compare. (JA 397).

Lamb contacted Lyle C. Shaver, Forensic Science Supervisor for the Virginia Department of Forensic Science in the Western Regional Laboratory in Roanoke, Virginia, and learned that the other latent fingerprint was from the Franklin County burglary. (JA 962). Lamb reported that he asked Shaver to verify his comparison and that Shaver did verify that the prints were made by the same individual. (JA 962, ex 3 206). "Verification," is also a significant term in fingerprint science: it is the final step that must occur in making an individualization and involves a separate comparison by another examiner. (JA 968-969). At the time, however, Lamb possessed the Fredericksburg latent lift, and the Department of Forensic Science does not draw conclusions based on AFIS images, but only manually with actual evidence.[1] (JA 938). Documentation from Western Lab also demonstrates that Shaver performed no verification of the latent to latent comparison. (*Id*. and JA 1349-1350). Thus, Lamb falsely reported during his investigation that he individualized the latent prints from the Fredericksburg

---

[1] Lamb and Shively knew that a "hit" by AFIS is insufficient for individualization; it must be tested by an examination of the actual lifts. (JA 110-111). Looking at AFIS images is insufficient to make a positive fingerprint identification. (*Id*.)

and Franklin County burglaries and falsely reported that Shaver verified his findings.

Shaver did inform Lamb that the Franklin County print had been run through AFIS in 2010, but no "hit" resulted. (JA 724). Shaver provided Shively's contact information to Lamb. (JA 721-723).

**Defendants Focus on Ryan Lucas**

On March 29, 2012, Lamb contacted Shively and informed him that he had connected the latent fingerprints from the Fredericksburg and Franklin County burglaries, even though Lamb had not truly individualized the prints. (JA 410). Lamb also informed Shively that the suspect had distinctive full sleeve tattoos on his arms, that he was possibly homeless, and that his first name might be Ryan, although Lamb told Shively that the information regarding the name had come from a homeless person, and could not be relied on. (JA 707-719). Lamb's comments to Shively throughout the course of the investigation made it clear that Lamb had neither use nor sympathy for the homeless population in his area, and he regarded them with disdain and distrust. (JA 715-716). Lamb gave Shively the following description of the suspect: 5'9" to 5'11"; weight 150, 160; thin; brown hair with a little bit of waviness to it; tattoos on both arms but no tattoos on his front or back. (JA 712-713).

Shively told Lamb he would investigate the Hardy Road Trailer Park, in his words, "a notorious shit hole," for leads. (JA 715). He contacted Jerry Shyeb, who was not familiar with any person fitting that description. (JA 228). Shively also went to a local lawn mower repair shop and told the occupants of the shop that he was looking for a "Ryan" in connection with the Shyeb burglary. (JA 77-78). The owner of the shop later called Shively and told him that another anonymous person in the shop who had overheard Shively had given the owner the name of Andre Lucas and indicated that he thought Andre had a son. (*Id*.) Shively did not interview the individual who allegedly proffered the information and did not even get the identity of the "informant." (JA 82-83). Instead, he went through his records for the last name Lucas and found Ryan Lucas who had first encountered the Franklin County Sheriff's Office in 1997 when he turned himself in on a failure to appear capias that was issued for missing a court date on an under-aged possession charge. (JA 85-86).

Shively told Lamb that Ryan had tattoos on his arms. (JA 728). Shively and Lamb talked about showing Ryan's DMV picture to Gaffney for identification. (JA 730-731). Contrary though to Mr. Gaffney's description of the burglar, the description of Ryan Lucas available to Lamb and Shively established that he weighed 210 to 217 lbs, approximately 60 to 70 lbs more than the suspect. (JA 235, 231). Shively also ran Ryan's criminal record, and learned that while Ryan

9

had been previously arrested for traffic offenses and DUI in the jurisdictions surrounding Franklin County, there were no burglary, trespass, or breaking and entering charges. (JA 728). Shively and Lamb would have known that as a result of these earlier arrests, Ryan's prints would have been in the AFIS system when the Franklin County and Fredericksburg latent fingerprints were entered into the AFIS system and run for known contributors. However, neither AFIS search returned Ryan's print as a potential candidate for comparison. (JA 325, 962). Nevertheless, Shively had Ryan's fingerprints on file and mailed and faxed them to Lamb on April 11, 2012. (JA 728-729, 965).

Due to the poor quality of the facsimile, Lamb could not compare all of the fingerprints and contacted Shively on April 11, 2012, requesting that Shively mail the actual fingerprint card. (JA 732-733, 965). Shively also delivered them to Lyle Shaver at the Western Regional Lab. (JA 728, 151, 938). Prior to mailing Lamb the prints, Shively asked Lamb what Lamb was going to do if the prints that he was sending Lamb in the mail matched up, and Lamb responded that he was going to get a warrant to arrest Ryan. (JA 734). Both parties concluded that if Lamb matched Ryan's prints to the Fredericksburg print, then Ryan's print would also match the Hardy prints. (JA 734-735). This conclusion was erroneous and reckless as Lamb and Shively knew that Lamb had never individualized the Franklin County latent print to the Fredericksburg latent print. (JA 110-111). Nevertheless,

10

Shively responded that he would get warrants on Lucas too, and Lamb agreed.

Shively then stated, "I'll still have to send my stuff to the lab you know to get it

confirmed and all but hell we might, if he's looking at more charges at one time,

hell it's no telling the cases he's done between here and Fredericksburg." (JA 735).

Both Lamb and Shively were very excited about the number of possible cases they

could clear if Lamb matched the fingerprints. (JA 735).

Lamb compared the Fredericksburg latent fingerprint to the "poor quality"

facsimile of Ryan's known prints, and determined that Ryan's left thumb print

from the facsimile copy of the arrest card and the latent lift L6 from the piggy bank

matched. (JA 965). Lamb had six good prints on the piggy bank, the majority of

which Lamb thought were contributed by the suspect, but only one print

supposedly matched that of Ryan.  Several of the latent impressions recovered

from the bank did not come back to Ryan. (JA 565).

Lamb did not compare the Franklin County latent fingerprint to Ryan's

prints. (JA 361-363, 410). This comparison was never performed prior to Shively

obtaining arrest warrants.  Without waiting to receive the actual fingerprint card in

the mail, Lamb contacted Shively at 11:50 a.m. on April 12, 2012 and informed

Shively that Ryan's fingerprints matched the latent print recovered from the

Fredericksburg crime scene. (JA 746-748).  Shively knew that this identification

had been made only on the basis of a facsimile, which was admittedly of poor

11

quality, and that Lamb had never compared Ryan's prints with the Franklin County latent print lift (rather than the AFIS image). Shively had instead brought the Franklin County latent lift and Ryan's prints to Western Lab for individualization and was awaiting results. Nevertheless, when Lamb informed Shively that he was seeking an arrest warrant for Ryan, Shively also sought warrants for Ryan for the Hardy burglary. (JA 747). Lamb had not obtained, or even considered obtaining, elimination prints from the occupants of the Gaffney residence prior to obtaining the arrest warrants, despite the fact that five of the good prints on the piggy bank did not match Ryan's prints. (JA 565, 570). Lamb did not tell Shively to wait for the fingerprint examination results for the comparison of Ryan's prints to the Franklin County latent lift before getting the warrant, but later recognized that he should have told Shively to get an independent examination of the Franklin County prints. (JA 433-434). Significantly, Lamb's notes of his telephone conversation with Shively in which they discussed getting warrants, which were made AFTER Ryan had been arrested and denied involvement in the burglaries, state:

> On 12 April 2012 at 1234 hours this Officer telephoned Inv. Shively and informed him of the fingerprint individualization. He stated that he was going to get warrants on Lucas for his burglary as well. This Officer encouraged Inv. Shively to let Mr. Shaver, the FP Examiner from the State Lab who was handling the case, examine Lucas' known ten prints against the latent from the Smith Mountain Lake crime scene [a comparison of latent impressions from the AFIS computer screen is not a confirmation of a "Hit"; the latent needs to be examined versus the offender's known ten prints directly to individualize]. Inv. Shively said that he would send a copy of the ten

> prints to Mr. Shaver for a direct comparison. [Please note that Inv.
> Shively got warrants on 12 April for Ryan Lucas for his burglary
> case.]

(JA 564).  It is clear that Lamb added this note to the police file after the fact in

order to exonerate himself from any responsibility for the improper arrest of Ryan

for the Franklin County offenses.

Lamb's comparison of the Fredericksburg latent print to Ryan's known print

also deviated from protocol in that he failed to obtain verification of his conclusion

prior to declaring an individualization. (JA 316-317, 968-970).  The ACE-V

scientific method is used to develop and confirm an individualization. (JA 968-

970).  ACE-V stands for Analysis, Comparison, Evaluation, and Verification. (*Id*.)

The examiner must first determine if the latent print is of sufficient quantity and

quality to even perform a comparison. (*Id.*; JA 1238-1239). During the comparison

phase, the examiner must look for discrepancies and dissimilarities among the

minutiae of the print. (JA 1207-1208, 1212-1214, 1219-1221).  If the examiner

believes the prints can be individualized he must submit his work to another

examiner for verification before the individualization can be confirmed. (JA 1174,

1188, 1214-1215, 1217-1218; 1278-1280).  According to Lamb, he adheres to the

ACE-V methodology, but he did not obtain verification of his conclusion before

getting warrants.  In fact, according to Lamb, he routinely operates this way and

only obtains verification of his analyses before the cases go to trial. (JA 313-314).

13

When Lamb actually did submit his analysis for verification (two weeks after applying for warrants on Ryan and two days after he had been arrested), the examiner told Lamb he could not verify the analysis because the copy Lamb provided him was insufficient in quality. (JA 316-318). When expert witness Robin Young examined the Fredericksburg latent print against Ryan's known print, he easily concluded the prints could not be individualized. (JA 1196-1198). Lamb now agrees with expert Young's conclusion. (JA 321, 326).

Lamb never analyzed the Fredericksburg latent print against the Franklin County latent print, even though he reported he had "individualized the prints" and that Shaver had "verified" his work. (JA 410). Lamb never compared the Franklin County latent print to Ryan's known print. (JA 361-362). Shively had brought the Franklin County latent print and Ryan's known print to the Western Lab for examination but had not received any information back from Lyle Shaver before he obtained the warrants on Ryan. Shively knew that he would still need to have his things confirmed by the lab, yet he nevertheless obtained warrants. (JA 735).

Neither Lamb nor Shively conducted any additional investigation regarding Ryan's physical appearance, particularly the presence or absence of full sleeve tattoos, his shoe size, or the 60 pound weight discrepancy before obtaining warrants. Neither defendant investigated Ryan's work history, his potential for being homeless, any ties to Fredericksburg, or his whereabouts on the dates in

14

question, before seeking arrest warrants for Ryan. There were no discussions between Lamb and Shively about looking for Ryan and interviewing him before obtaining the warrants. (JA 438). The footprints from the two crime scenes were never compared. Lamb stated that he had not shown the victim the line up yet, because he wanted to get the warrants on Ryan first. (JA 749-750). Likewise, Shively planned to go over to Hardy and start looking for Ryan and make contact with his people only after the warrants were issued. (*Id*.)

Lamb and Shively also knew that the "modus operandi" of the two burglaries was quite different. The Hardy burglary involved a forced break-in into an unoccupied vacation home and the theft of large ticket items. The Fredericksburg burglary was one of many similar burglaries in Fredericksburg where only cash was taken. Neither Lamb nor Shively ever gave any attention to this factor.

Disregarding all evidence to the contrary and ignoring leads and avenues of investigation, both Lamb and Shively obtained felony warrants for Ryan. (JA 964, 242).

**Post Arrest Warrant Investigation and Activity**

Lamb and Shively spoke by telephone on April 19, 2012, a week after they had obtained the arrest warrants. (JA 752-756). Shively said he had gone by the house in Hardy where he thought Ryan's parents were living, but no one was

15

home. (*Id.*)  He did note a car at the residence registered to Ryan Lucas. (*Id.*)  He also confirmed that he had not heard anything from Lyle Shaver, the fingerprint examiner at the Virginia Forensic Lab. (*Id.*)  Lamb stated that there had been a similar break-in the day before in Stafford County, where the white male went in, went upstairs and then ran out, and that this was consistent with "our guy's M.O." going into occupied residences. (*Id.*)  The burglary in Franklin County, though, did not involve an occupied residence, but rather a part time residence which was clearly unoccupied at the time of the burglary.

Lamb contacted Shaver at the state lab on April 24, 2012. (JA 938).  Lamb indicated that he had identified but not yet verified, the latent print in his case to the suspect's known prints, but was having issues with the Franklin County latent print and the suspect's known prints. (*Id.*) Lamb told Shaver that he had looked at the Franklin County registered latent print from AFIS and that he did **NOT** believe it matched Ryan's prints. (JA 938, 953).  However, just two weeks prior he agreed with Shively that Shively should get warrants on Ryan for the Franklin County burglary.  Despite the fact that Ryan's prints did not match the Franklin County latent print, neither Lamb nor Shively sought to retrieve the warrants, or have the charges dismissed.

 Ryan was arrested at approximately 10:30 a.m. on April 24, 2012 at his place of employment in Roanoke. (JA 990-995, 1018). He was served with three

16

warrants from Franklin County and two warrants from the City of Fredericksburg. Lamb told Shively that he did not commit the burglaries, and that he was working on the day of the Fredericksburg burglary. (JA 228-229). Ryan told Shively he did not even know where Fredericksburg was. (*Id*.) At 1:50 p.m. on April 24, 2012, Shively telephoned Lamb and told him that Ryan had said there must have been a glitch in the fingerprint evidence because he was at work at the time of the Fredericksburg burglaries. (JA 763-764). This was confirmed by Ryan's employer by 9:13 a.m. the next morning. (JA 261-262; 782-784). Shively took photographs of Ryan after he was arrested and processed into the Franklin County Jail. (JA 768-769, 772-773). The photographs show that Ryan did not have full sleeve tattoos, but did have a prominent tattoo on his chest. (JA 250-260). He also had short straight hair and a vivid tan line across the back of his neck. (*Id*.) All of these facts contradicted the physical description of the perpetrator in Fredericksburg. He was also heavier than the suspect. (*Id*.) Both Shively and Lamb acknowledged that the lack of tattoos did worry them, but they continued to hold Ryan on the warrants. (JA 261-262). Later on April 25, 2012, Shively called Lamb and said that he had been talking to Ryan's mother, Teresa Lucas, and it sounded like there was a mix up in the names and fingerprints somewhere along the line. (JA 780). Nevertheless, Mr. Lucas continued to be detained in jail.

17

Almost immediately after Ryan was arrested, Ryan's sister, Andrea Bailey, communicated by phone with Ryan several times a day, and also with the defendants, explaining to them why Ryan could not have committed these burglaries. (JA 943-944). Andrea told Lamb that Ryan had a shoe size of 11 or 12. (JA 947). At some point, Lamb told her that he did not think that Ryan had committed the crime in Fredericksburg, and that he was trying to fix things. (JA 945). Lamb told her that they had to wait for fingerprints to come back from the state lab. (JA 946). Lamb told Andrea that the fingerprints he had in Fredericksburg did not match the fingerprints from the Franklin County burglary. (JA 948). Andrea told Shively that the fingerprints did not match, but Shively refused to consider this information. (JA 949-950).

On April 27, 2012, Ryan, still incarcerated in Franklin County, received word that the Fredericksburg charges had been dropped. Also on April 27, Shively contacted Shaver at the state lab and said he was curious about the case because Ryan's alibi checked out, and the victim in Fredericksburg could not ID Ryan as the suspect. (JA 951). Shaver left a message for Shively on April 27 that Ryan's prints did not match the Franklin County latent print. (JA 952). Late on April 27, 2012, Ryan bonded himself out of the Franklin County Jail, because he knew he would not be immediately remanded to Fredericksburg. (JA 1006-1007, 1015).

18

After the Fredericksburg charges were dropped, and Shaver had notified Shively that Ryan's prints did not match the Franklin County print, Lamb documented several activities in what could only have been an effort to justify his rash rush to judgment on Ryan. (JA 788-800; 568, 571).  He allegedly showed Ryan's picture to Gaffney, an unidentified employee at the 7-11, and other unidentified individuals at businesses allegedly for the purpose of investigating the possibility of someone who looked like Ryan committing crimes in Fredericksburg. (JA 472-475).  Shively told Lamb that Ryan and his family were all up in the air because the Fredericksburg charges had been dismissed and now they were threatening to call the local television channel. (JA 793).  In discussing this possibility, Shively stated, "I started to say, you know bitch I don't care if you call Animal Planet," and Lamb responded, "It ain't going to help anything." (*Id*.)

On April 30, 2012, the State Lab issued a Certificate of Analysis to Shively based on its examination of the Franklin County latent and Lucas's known prints concluding that Lucas was not the source of the Franklin County latent print. (JA 264-265).  On April 30, 2012, the Franklin County Commonwealth's Attorney requested that the Franklin County charges be dismissed.  The Franklin County charges against Mr. Lucas were not dismissed until on or about May 2, 2012.

In retrospect, Lamb admitted that he should have told Shively to have his own fingerprint examiner examine their prints down in Franklin County before

19

getting a warrant for Ryan, and that he should have shown Gaffney the line up earlier. (JA 433-434, 468).  He has also admitted that it might be wise to move up the verification process, rather than waiting until just before the case goes to trial to verify the fingerprints. (JA 348).

### Post Summary Judgment Hearing Submissions

In response to the district court's request for supplemental briefing on fingerprint analysis, specifically the verification step of the "ACE-V" process, Ryan submitted information from forensic science organizations providing that ACE-V is a respected method of fingerprint analysis; however, the methodology must be properly applied in order for the analysis to be reliable. (JA 1278-1280). According to forensic guidelines, verification is a critical step in the ACE-V analysis.

Defendant Lamb agreed that verification is part of the ACE-V procedure, and stated that "The verification is part of the procedure to preserve the sanctity of the science." (JA 319, 328).  Lamb also testified that he was familiar with the SWGFAST (Scientific Working Group on Friction Ridge Analysis, Study and Technology) guidelines, and that his agency uses SWGFAST and FBI guidelines. (JA 337).  Lamb interned at the Virginia Forensic Science Academy. (JA 293). Lamb attended a Sirchie training in May, 2012, which would have included ACE-V as a topic. (JA 1278-1280).

Pursuant to the Virginia Department of Forensic Science Latent Print Procedures Manual, friction ridge print examinations are conducted under the ACE-V methodology, utilizing both qualitative and quantitative analysis. (JA 1279, 1349-1350). Verification is the independent application of the Analysis, Comparison and Evaluation methodology to a friction ridge print by another examiner. (*Id*.) All individualizations must be verified. (*Id*.) Verification must be completed prior to communicating the information to the contributor, either verbally or in writing. Additionally, the Certificate of Analysis will not be generated prior to verification. (*Id*.) It is clear from the Virginia Department of Forensic Science Latent Procedure Manual that verification is a critical part of the process, and that a fingerprint identification is not complete, and cannot be used to identify a suspect, until it has been verified. The examiner cannot even notify the police officer who has submitted the fingerprint until there has been written verification of the identification.

Likewise, pursuant to SWGFAST Documents #8, Standard for the Documentation of Analysis, Comparison, Evaluation and Verification (ACE-V) (Latent), all individualizations shall be verified. (JA 1291-1292). Pursuant to SWGFAST Document #10, Standards for Examining Friction Ridge Impressions and Resulting Conclusions (Latent/Tenprint), a conclusion of individualization shall be verified. (JA 1315-1323). SWGFAST Document #9, Standards for the

21

Documentation of Analysis, Comparison, Evaluation and Verification in Tenprint

Operations, similarly provides that verification shall be documented. (JA 1305-

1308).

The FBI lab published a study on the Accuracy and Reliability of Forensic

Latent Fingerprint Decisions, reporting on the first large-scale study on the

accuracy and reliability of latent fingerprint examiners' decisions. (JA 1278-1280,

1333-1338).  The study involved 169 latent print examiners, and each compared

100 pairs of latent and exemplar fingerprints. (*Id*.) Five examiners made a total of

six false positive errors. (*Id*.)  However, verification detected all false positives.

(*Id*.) The report indicates that SWGFAST requires verification for

individualization decisions, and that the evidence suggests that these erroneous

individualizations would have been detected if verification had been routinely

performed. (*Id*.)

Robin Young, Ryan's expert witness on fingerprint analysis has 40 years of

experience in the Science of Fingerprints. (JA 1278-1280).  According to Young,

verification is critical to the analysis because it provides necessary quality

assurance and reliability to prevent wrongful arrests, prosecutions and

incarcerations. (*Id*.)  The fingerprint science community recognizes the critical

nature of the verification step in the methodology (see the studies and documents

discussed above). Young further emphasized that for the last several years, the

reliability of the science of latent fingerprint analysis has been under review, as a result of the *Mayfield* case where the FBI incorrectly identified a suspect in a bombing in Spain based on faulty fingerprint analysis. (*Id*.) Latent fingerprint examiners have been aware of this review and consider it when performing their daily duties. (*Id*.) Young stated that responsible examiners understand the need for verification and would not take action on a comparison until their conclusions have been verified. (*Id*.)

Following the supplemental submissions, the district court granted summary judgment for the defendants on July 7, 2014.

## SUMMARY OF ARGUMENT

In ruling on Summary Judgment, the district court resolved disputed errors of material fact, and failed to consider the facts in the light most favorable to Ryan. These disputed issues of material fact reflected on the probable cause determination and the question of whether the warrant applications were made recklessly, and posed questions for the jury to answer, not the district court. The evidence before the district court, when viewed in the light most favorable to Ryan, would support a finding that Lamb and Shively must have entertained serious doubts as to the accuracy of the information they reported. *See Miller v. Prince George's County, Maryland*, 475 F.3d 621 (4th Cir. 2007). A reasonably well trained officer in the same position as Lamb and Shively would have known that

23

his application failed to establish probable cause and that he should not have applied for the warrant. *Malley v. Briggs*, 475 U.S. 335 (1986).

The district court further erred in narrowing the question of recklessness to the verification component of "ACE-V" fingerprint identification. The district court requested additional briefing on the verification component then disregarded the authorities Ryan presented on the importance and necessity of verification. The district court also disregarded other facts, as well as exculpatory information, which favored Ryan. The evidence, when viewed in the light most favorable to Ryan, did not establish probable cause for Ryan's arrest.

Furthermore, Lamb and Shively continued to detain Ryan, even after they knew that any probable cause had dissipated. Once Ryan was arrested on April 24, it was clear that he did not have full-sleeve tattoos, that he did have an alibi for the Fredericksburg burglary, and that no one had individualized Ryan's print to the Franklin County latent print. Nevertheless, Lamb and Shively continued to detain Ryan without probable cause.

Similarly, as genuine issues of material fact existed regarding the probable cause determination, the district court should have denied summary judgment on the state law claims as well. The district court did not specifically address the state law claims. However, in viewing the evidence in the light most favorable to Ryan, it is clear that Ryan was restrained without any sufficient legal excuse, and that

Lamb and Shively actively instigated, directed or procured the unlawful arrest, making them liable for false arrest and imprisonment under Virginia state law. *See Montgomery Ward & Company v. Wickline*, 188 Va. 485, 50 S.E.2d 387 (1948); *Smith v. Button*, 43 Va. Cir. 379, 1997 WL 3361883 (Richmond City 1997). Lamb and Shively set the prosecutions afoot, the prosecutions terminated in favor of Ryan, and the prosecutions were malicious and without probable cause, thus making Lamb and Shively liable for malicious prosecution under Virginia state law. *See Clinchfield Coal Corporation v. Redd*, 123 Va. 420, 96 S.E. 836 (1918). Moreover, Lamb and Shively continued to detain Ryan after probable cause had dissipated. *See Bain v. Phillips*, 217 Va. 387, 394, 228 S.E.2d 576 (1976), n. 4. Accordingly, summary judgment on the state law claims for false arrest and imprisonment and malicious prosecution should have been denied.

Based on the foregoing errors, the district court judgment should be reversed, and the case remanded for a jury trial.

## ARGUMENT

## I.    The District Court Erred In Granting Summary Judgment In Favor Of Defendants Lamb And Shively On The Federal Claims

### A.    Standard of Review

The Court reviews *de novo* a district court's order granting summary judgment. *Bland v. Roberts*, 730 F.3d 368 (4th Cir. 2013). Summary judgment is

appropriate if the movant shows there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. F.R.C.P. 56(a).

**B.     Argument**

**1.     The District Court Erred In Resolving Disputed Issues Of Material Fact Which Should Have Been Submitted To A Jury**

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate only if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  In order to grant a motion for summary judgment, the court must conclude that the current pleadings, submissions and affidavits, when taken in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact, entitling the moving party to judgment as a matter of law.  *Celotex Corporation v. Catrett*, 477 U.S. 317 (1986). The court must view the facts in the light most favorable to the party opposing the motion.  *Porter v. U.S. Alumoweld Company*, 125 F.3d 243, 245 (4th Cir. 1977).

Summary judgment is only permissible where, after viewing the facts and inferences in the light most favorable to the non-moving party, no reasonable juror could find for the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-249 (1986).  In other words, if a reasonable juror could find for plaintiff, summary judgment is improper. *Id.*  A court may not resolve disputed facts, weigh the evidence, or make determinations of credibility. *Russell v.*

26

*Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995); *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986). Because inferences and the weighing of credibility are often central to assessing intent or motive, courts, including the Fourth Circuit, direct that judges employ extra caution when evaluating dispositive motions in such cases. Courts must take special care when considering a motion for summary judgment in a case where motive is a critical issue. *See, e.g., Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 958 (4th Cir. 1996).

Lamb and Shively asserted qualified immunity as a defense. Government officials are entitled to qualified immunity from civil liability for performing discretionary functions only insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining whether a government official is entitled to qualified immunity, the court must (1) identify the right allegedly violated, (2) determine whether the constitutional right violated was clearly established at the time of the incident, and (3) evaluate whether a reasonable official would have understood that the conduct at issue violated the clearly established right. *Henderson v. Simms*, 223 F.3d 267, 271 (4th Cir. 2000). If there is any material factual dispute about a defendant's conduct, summary judgment on qualified immunity grounds is improper. *Rainey v. Conerly*, 973 F.2d 321, 324 (4th Cir. 1992). Motive and intent are questions of fact for a

27

jury. *Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3rd Cir. 2006). Officers are not afforded qualified immunity when they are plainly incompetent or knowingly violate the law. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Ryan alleged that the warrant applications contained misrepresentations and omissions made deliberately, or with reckless disregard for whether they thereby made the affidavit request for a warrant misleading. This determination is a question of fact for the jury. *See Miller v. Prince George's County, Maryland*, 475 F.3d 621, 629 (4th Cir. 2007) (explaining that a reasonable jury could reach such a conclusion if the plaintiff's version of the facts were determined to be true). In *Miller*, this Court held that all of the evidence, when viewed in the light most favorable to plaintiff, would support a finding that the detective must have entertained serious doubts as to the accuracy of the information he reported. *Id., citing Wilson v. Russo*, 212 F.3d 781, 788 (3rd Cir. 2000).

Officers have no immunity based on a magistrate's warrant where a reasonably well trained officer in the same position would have known that his application failed to establish probable cause and that he should not have applied for the warrant. *Malley*, 475 U.S. at 345. Thus, the initial question the district court should have considered is whether Ryan presented sufficient facts that if believed, so differed from the accounts defendants presented to the magistrates that a jury could reasonably find that defendants intentionally or recklessly

28

mischaracterized or omitted material facts in their warrant applications. The district court did not consider that the jury could have believed the facts Ryan presented. The district court resolved disputed issues of fact in favor of defendants.

The district court improperly narrowed the question of recklessness to the verification issue then disregarded the authorities Ryan presented on the issue. All respected authority from the forensic science community mandates verification of all individualizations prior to communicating the results to law enforcement for action. The district court also minimized the following facts (favorable to Ryan) known to both defendants prior to obtaining arrest warrants:

(1) The name "Ryan" came from an unreliable source who was transported to a mental health and substance abuse treatment center immediately following the tip;

(2) "Ryan" became Ryan Lucas based on information allegedly conveyed by an anonymous bystander at the lawn mower repair shop, who was never investigated, verified, or even identified;

(3) Ryan Lucas had an address in Franklin County with a vehicle registered to him;

(4) there was a 60 pound weight difference between Ryan Lucas and the suspect in the Fredericksburg burglary;

(5) the geographic distance between the burglaries and lack of evidence that Ryan Lucas had ever left the Franklin County/Roanoke area;

(6) the significant difference in *modus operandi* between the two burglaries;

(7) Lamb's failure to bring Ryan's DMV photo to Gaffney for identification;

(8)  the footprint impressions had never been compared to determine any relation whatsoever;

(9) Shively's deliberate decision to wait to try to contact Ryan until after warrants had been issued;

(10) the facsimile copy that Lamb used to "match" the thumbprint was not a good copy;

(11) Lamb had not received the originals in the mail from Shively at the time they sought the warrants;

(12) Lyle Shaver had not completed his analysis of the Franklin County print and Ryan's print;

(13) Five of the six good prints that were lifted from the piggy bank did not match those of Mr. Lucas;

(14) the fingerprint analysis had not been verified;

(15) there had never been a latent to latent individualization of the Franklin County and Fredericksburg prints;

(16) lack of similar criminal history;

(17) Lamb and Shively knew that Ryan's prints were in AFIS and yet were never returned by the AFIS system as a known contributor candidate for either the Franklin County or Fredericksburg latent prints;

(18) Lamb deliberately misstated facts in his investigative report; he reported he had completed fingerprint individualizations when he had not and that he had obtained verification of his analyses when he had not;

(19) Shively knew that he had to have the Franklin County latent print individualized to Ryan's by Western Lab, but obtained warrants prior to getting the results.

These facts, if believed by a jury, support a finding that Lamb and Shively must have entertained serious doubts about the information they reported to the magistrate. A reasonable jury could conclude that defendants' warrant applications contained misrepresentations and omissions made deliberately or with reckless disregard as to whether they made the affidavits misleading. The district court failed to view the facts in the light most favorable to Ryan, though, and resolved conflicting facts in favor of the defendants. The district court erred in failing to take the facts in inferences in the light most favorable to plaintiff and by resolving disputed issues of material fact. The district court decision must be reversed, and the matter must be remanded for trial.

**2.    The District Court Erred In Ruling As A Matter Of Law That Defendants Had Probable Cause To Seek Arrest Warrants For Ryan**

Under federal law:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privilege, or immunities secured by the constitution .... shall be liable to the party injured in any action at law.

42 U.S.C. §1983.  The Fourth Amendment protects individuals from unreasonable searches and seizures by government officials and those private individuals acting as instruments or agents of the government. *United States v. Jarrett*, 338 F.3d 39 (4th Cir. 2003).  A person has been seized within the meaning of the Fourth Amendment if, in view of all the circumstances surrounding the incident, a reasonable person would believe he was not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

To establish an unreasonable seizure under the Fourth Amendment, Ryan must show that he was arrested without probable cause. *Brown v. Gilmore*, 278 F.3d 362, 366-369 (4th Cir. 2002); *Baker v. McCollan*, 443 U.S. 137, 143 (1979); *see also Street v. Surdyka*, 492 F.2d 368, 372-73 (4th Cir. 1974) (a cause of action for false arrest exists if the officer lacked probable cause).  Probable cause is determined from the totality of the circumstances known to the officer at the time of the arrest. *Id., citing United States v. Garcia*, 848 F.2d 58, 59-60 (4th Cir. 1988).

Probable cause exists when the facts and circumstances within the officer's knowledge, and of which he had reasonably trustworthy information, were sufficient to warrant a prudent man in believing that the individual had committed or was committing an offense. *Beck v. Ohio*, 379 U.S. 89 (1964).

Two factors govern the determination of probable cause in any situation: the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct. *Brown v. Gilmore*, 278 F.3d 362, 366-69 (4th Cir. 2002), *citing Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992). Therefore, probable cause could be lacking in a given case, and an arrestee's rights violated, either because of an arresting officer's insufficient knowledge or legal misunderstanding, or both. *Id.*

In *Malley v. Briggs*, 475 U.S. 335 (1986), plaintiffs brought a civil rights action against a state trooper, alleging that the trooper, in applying for the warrants to arrest them, violated their rights under the Fourth and Fourteenth Amendments. The Supreme Court ruled that the police officer cannot avoid liability under the rule of qualified immunity on the grounds that the act of applying for the arrest warrant is *per se* objectively reasonable where the officer believes that the facts alleged in his affidavit are true, and that he is entitled to rely on the judicial officer's judgment in issuing the warrant and hence finding that probable cause exists. The question is whether a reasonably well-trained officer in the same

33

position would have known that his application failed to establish probable cause and that he should not have applied for the warrant. If such is the case, the application for the warrant was not objectively reasonable, because it created the unnecessary danger of an unlawful arrest.

In determining whether a defendant is entitled to qualified immunity, the guiding principle is that the shield of immunity will be lost where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable. *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991), *citing Malley v. Briggs*, 475 U.S. 335, 344-45 (1986). Obtaining an arrest warrant does not provide *per se* evidence of objective reasonableness. *Id.*

To show a constitutional violation, Ryan must establish that Lamb and Shively deliberately or with a reckless disregard for the truth made material false statements in their applications, or omitted from those applications material facts with the intent to make, or with reckless disregard of whether they thereby made, the application misleading. *Miller v. Prince George's County, Maryland*, 475 F.3d 621, 626-31 (4th Cir. 2007) (*citing Franks v. Delaware*, 438 U.S. 154, 171 (1978); *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990)). To establish "reckless disregard," Ryan must offer evidence to show that Lamb and Shively were aware that the statements in the warrant application were probably false or that they omitted information that they knew would negate probable cause. *Id.* at 627. The

Fourth Amendment is violated when false statements or omissions submitted in

support of a warrant are material, that is, necessary to the magistrate's finding of

probable cause. *Miller v. Prince George's County, Maryland*, 475 F.3d 621, 628

(4th Cir. 2007).  To determine materiality, the court must excise the offending

inaccuracies and insert the facts recklessly omitted, and then determine whether or

not the correct warrant affidavit would establish probable cause.  *Id.*

> As this Court recently observed *en banc:*

> In the end, this may be a case where an officer committed a
> constitutionally unreasonable seizure as the result of an unreasonable
> factual mistake.  If he did, he is no more protected from civil liability
> than are the well-meaning officers who make unreasonable legal
> mistakes regarding the constitutionality of their conduct.

> ***

> Although officers are only human and even well-intentioned officers
> may make unreasonable mistakes on occasion the doctrine of
> qualified immunity does not serve to protect them on those occasions.

*Henry v. Purnell*, 625 F.3d 524, 535 (4th Cir. 2011) (*en banc); see also, United

States v. Black*, 70 F.3d 541 (4th Cir. 2013).

In *Clipper v. Takoma Park, Md.*, 876 F.2d 17 (4th Cir. 1989), this Court

ruled that probable cause did not exist for arrest of a suspect in a bank robbery and

the police officer's conduct consequently violated the suspect's civil rights.  The

officer failed to interview the individuals called to his attention by the suspect who

would have established his alibi, the principal investigating officer testified that

another officer on the scene told him that he was not sure that the suspect was the

robber, and the police did not look at the surveillance film from the bank. This Court upheld a jury verdict for the violation of Clipper's constitutional rights.

In this case, there was no probable cause for the arrest warrants. A reasonable officer in Lamb and Shively's position would have known that their applications failed to establish probable cause, and that they should not have applied for the warrant. Both Lamb and Shively omitted material facts with the intent to make, or with reckless disregard of whether they thereby made, their applications misleading. In addition to the multiple factors enumerated above in Argument B (1), Lamb knew that he had never individualized the Franklin County and Fredericksburg latent prints (even though he reported otherwise); he knew that Shaver had not verified any analysis comparing the Fredericksburg and Franklin County latent prints (even though he reported otherwise); he knew that he had not verified the alleged individualization of Ryan's print to the Fredericksburg latent print and thus should not have taken any action on the comparison or advised Shively to take action. Lamb could only say that one of the six prints that were left on the piggy bank allegedly matched Ryan's prints (which we now know is incorrect as Lamb agrees Ryan's print does not match the latent print), but he failed to obtain fingerprints from the Gaffneys to eliminate them as contributors of the prints. Lamb failed to wait for his alleged comparison to be verified before

obtaining warrants.  Lamb knew that he was not adhering to the ACE-V procedure required for fingerprint examinations.

Also, Lamb and Shively recklessly omitted significant information regarding the case against Ryan from their warrant applications. *See* the enumerated factors listed Argument B (1) in comparison with Shively's application for warrant (JA 242) and Lamb's testimony regarding what he told the magistrate as no written record exists (JA 495-496, 430-433).

Although Lamb informed Shively that the Franklin County latent print matched the Fredericksburg latent print, it is in dispute as to whether Lamb informed Shively that the fingerprints from the Hardy burglary matched the known prints of Ryan Lucas.  Shively says he did and Lamb is apologetic if he gave Shively that impression, but Lamb never actually performed the individualization, and when he attempted to compare the prints, he told Shaver he could not individualize them.  Shively knew he needed to have the state lab review the prints and make a determination, but he still obtained the warrants prior to receiving the analysis conclusion from the lab.

Defendants violated Ryan's constitutional rights by arresting him without probable cause.  Defendants acted with reckless disregard when they omitted material facts which would have negated probable cause from their applications. The district court erred in ruling that Defendants had probable cause for Ryan's

arrest, and therefore erred in granting the Motions for Summary Judgment.  The decision of the district court must be reversed.

### 3.    Defendants Violated Ryan's Rights When They Continued To Detain Him After Probable Cause Had Dissipated

Ryan was arrested on April 24.  It immediately became clear to Defendants that Mr. Lucas did not have full-sleeve tattoos, and that he did not match the description of the Fredericksburg intruder.  Nevertheless, neither Defendant released Ryan from the charges.  Also on April 24, Lamb told Shaver at the state lab that he was having trouble with the prints from the Franklin County burglary.  Still, Ryan was not released.  On April 25, defendants confirmed that Ryan's work schedule would not have permitted him time to commit the Fredericksburg burglary.  Still, defendants continued to hold Ryan. On April 27, Shively received a call from Shaver at the state lab confirming that Ryan's prints did not match the prints left at the Franklin County burglary.  Lamb got the Fredericksburg charges against Ryan dropped on April 27; however, Shively did not move to drop the charges against Ryan until April 30.

The continuation of even a lawful arrest violates the Fourth Amendment when the police discover additional facts dissipating their earlier probable cause.  *BeVier v. Hucal*, 806 F.2d 123 (7th Cir. 1986).  A person must be released from arrest if previously established probable cause has dissipated. *United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005).

As previously discussed, Ryan was unlawfully arrested on April 24, as defendants did not have probable cause to seek the arrest warrants on April 12. Even if defendants had probable cause to seek the warrants on April 12, that probable cause dissipated on April 24 when Lamb admitted to Shaver that he could not match the Franklin County prints to Ryan, and when defendants confirmed that Ryan did not have full-sleeve tattoos. However, Ryan was not released by either Lamb or Shively. Any probable cause left dissipated on April 25 when Ryan's employer confirmed that he could not have committed the Fredericksburg burglary because he was working. Again, Ryan was not released on April 25 by either Lamb or Shively. Any remaining probable cause dissipated on April 27, when Shaver informed Shively that Ryan's prints did not match the prints of the Franklin County burglary. Although Lamb finally released Ryan on April 27, Shively did not seek to have the charges dropped until April 30. This continued detention after probable cause had dissipated was a violation of Ryan's rights, and the district court erred in granting summary judgment.

## II.     The District Court Erred In Granting Summary Judgment In Favor Of Defendants On The State Law Claims

### A.     Standard of Review

The Court reviews *de novo* a district court's order granting summary judgment. *Bland v. Roberts*, 730 F.3d 368 (4th Cir. 2013). Summary judgment is

appropriate if the movant shows there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  F.R.C.P. 56(a).

### B.    Argument

In addition to the claims under 42 U.S.C. § 1983, Ryan brought state law claims for false arrest, false imprisonment, and malicious prosecution.  The district court did not specifically address the state law claims, but rather, improperly ruled that as a matter of law, Defendants had probable cause to seek the arrest warrants and therefore granted summary judgment, apparently as to both federal and state law claims.  As discussed in Argument I B, the district court improperly resolved disputed issues of material fact regarding the existence of probable cause for Ryan's arrest, and these issues should have been submitted to the jury.  The same genuine issues of material fact exist regarding the state law claims.

False imprisonment is the restraint of one's liberty without any sufficient legal excuse therefore by word or acts which he fears to disregard, and neither malice, ill will, nor the slightest wrongful intention is necessary to constitute the offense. *Montgomery Ward & Co. v. Wickline*, 188 Va. 485, 50 S.E.2d 387 (1948).  The tort claim of false imprisonment is also commonly referred to as false arrest. *Coughlan v. Jim McKay Chevrolet, Inc.*, 18 Va. Cir. 265, 1989 WL 646697 (Fairfax Co. 1989).  The gist of the action is the illegal detention, without lawful process, or the unlawful execution of lawful process. *Montgomery Ward & Co.,*

*supra.* A party who actively instigates, directs, or procures the unlawful arrest of a person is liable for false imprisonment. *Smith v. Button*, 43 Va.Cir. 379, 1997 WL 33621883 (Richmond City 1997).

In order to maintain a malicious prosecution action, plaintiff must allege and prove (1) that the prosecution was set on foot by the defendant and that it terminated in a manner not unfavorable to plaintiff; (2) that it was instituted, or procured by the cooperation of defendant; (3) that it was without probable cause; and (4) that it was malicious. *Clinchfield Coal Corp. v. Redd*, 123 Va. 420, 430, 96 S.E. 836 (1918). The issuance of an arrest warrant does not permit the inference that probable cause had been judicially determined so as to bar the malicious prosecution action. *Niese v. Klos*, 215 Va. 701, 703-704, 222 S.E.2d 798 (1976). A person may be liable for malicious prosecution if he continues pressing the proceedings after he learns there is no probable cause for them. *Restatement 2nd of Torts*, § 655, comment b. One who initiates or continues criminal proceedings against another must have probable cause for doing so. *See Bain v. Phillips*, 217 Va. 387, 394, n. 4, 228 S.E.2d 576 (1976), *citing* Prosser*, The Law of Torts*, § 119.

Defendants did not have probable cause to obtain the warrants to arrest Ryan, and he was illegally detained. Defendants knew that Ryan could not have committed the crimes, but continued to detain him even after they received information which dissipated any probable cause. The process used to arrest Ryan

41

was unlawful, as it was procured using false information. Defendants instigated, directed and procured Ryan's unlawful arrest. The prosecution was set on foot by defendants, and it terminated in a manner not unfavorable to Ryan. Additionally, the prosecution was malicious; defendants intentionally and recklessly failed to investigate exculpatory information then relied upon a faulty and incomplete fingerprint analysis to obtain an arrest warrant. Defendants submitted warrant applications that contained misrepresentations and omissions made deliberately or with reckless disregard for whether they thereby made the request for a warrant misleading. Defendants' refusal to release Ryan, even after learning that he did not have full-sleeve tattoos, that he had an alibi for the time of the Fredericksburg incident, and that the fingerprints did not match, further underscores their malicious intent. The derogatory language used by Defendants in referring to Ryan highlights their malicious intent. (JA 765-767, 773, 791, 793).

There are genuine issues of material fact in dispute as to the state law claims, and the district court erred in granting summary judgment. The decision of the district court must be reversed and the matter remanded for a jury trial.

## CONCLUSION

For the foregoing reasons, Ryan respectfully requests that the judgment of the district court be reversed, and this matter be remanded for a jury trial.

42

Respectfully submitted this 21st day of October, 2014.

RYAN STILLMAN LUCAS

By: /s / John P. Fishwick, Jr.
Counsel

John P. Fishwick, Jr.
Counsel for Appellant
LichtensteinFishwick, PLC
101 S. Jefferson St., Suite 400
P.O. Box 601
Roanoke, VA 24001
Telephone: (540) 345-5890
Facsimile: (540) 345-5789
jpf@vatrials.com

## REQUEST FOR ORAL ARGUMENT

Counsel for appellant asserts that the issues raised in this brief may be more fully developed through oral argument, and respectfully requests the same.

## CERTIFICATE OF COMPLIANCE

1.    This brief of the appellant has been prepared using Microsoft Word software, Times New Roman font, 14 point proportional type size.

2.    EXCLUSIVE of the corporate disclosure statement; table of contents; table of authorities; statement with respect to oral argument; any addendum containing statutes, rules, or regulations, and the certificate of service, this brief contains 9,772 words.

Date: October 21, 2014                    By:  /s/ John P. Fishwick, Jr.
Of Counsel

43

## CERTIFICATE OF SERVICE

I certify that on October 21, 2014, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Jim H. Guynn, Jr.

Guynn, Memmer & Dillon, P.C.

415 South College Avenue

Salem, Virginia 24153

Jim.guynn@gmdlawfirm.com

Jeremy E. Carroll

Glenn, Feldmann, Darby & Goodlatte

37 Campbell Avenue, S.W.

Post Office Box 2887

Roanoke, Virginia 24001-2887

Jcarroll@gfdg.com

By: /s/ John P. Fishwick, Jr.

Of Counsel